MICHAEL HAMILTON *et ux.*          )
JUANITA HAMILTON,                  )
                                   )
    Plaintiffs,                     )
                                   )
vs.                                )          No. _____
                                   )          JURY DEMAND
CAR CREDIT, INC;                   )
TRACY McMURTRY, individually; and  )
CATHERINE McMURTRY, individually,  )
                                   )
    Defendants.                     )

## COMPLAINT

Come the Plaintiffs complaining of the Defendants and would show unto the court:

1.    <u>Jurisdiction</u>

This court has jurisdiction over the instant controversy by virtue of the applicable provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which is codified at 18 USC ¶¶ 1961 *et seq.*, and more particularly 18 USC ¶ 1964[a]. This litigation involves a Federal question within the meaning of 28 USC ¶ 1331. This Court has pendent jurisdiction over Plaintiffs' claims asserted under the Tennessee Consumer Protection Act, which is codified at TCA 47-18-101 *et seq.*, and Plaintiffs' asserted under the doctrine of common law fraud pursuant to Title 28 USC § 1367.

2.    <u>Parties</u>

2.1    <u>Plaintiffs</u>: The Plaintiffs are individually and collectively, adult citizens and residents of the Middle District of Tennessee. The Plaintiffs, all are unsophisticated purchasers and buyers.

2.2     Defendants

2.3     Defendant, Car Credit, Inc. [CC] is a Tennessee Corporation with its principal place of business in the Middle District of Tennessee. CC's registered agent for service of process is Catherine McMurtry, 319 Dickerson Pike, Nashville, Tennessee 37207-1317. CC is effectively owned and controlled by Defendants Tracy and Catherine McMurtry, as hereinafter more fully set out.

2.4     Defendants, Tracy McMurtry and Catherine McMurtry [Defendants McMurtry] are husband and wife and are adult citizens and residents of the Middle District of Tennessee. These Defendants are amenable to service of process at 2330 Baker Road, Nashville, Tennessee 37072. By virtue of the wrongful conduct articulated in this Complaint, Defendants McMurtry are indistinguishable from the corporate Defendant CC that both of them own and control. This corporation was created, and this corporation has been and is being operated, not as a single business entity but rather as an alter ego of Defendants McMurtry. Defendants have consistently ignored the concept of a true corporation, and have instead operated this purported corporate entity as their individual and collective domains. This purported corporation has been used by Defendants McMurtry both to defraud individuals, including the Plaintiffs here, and to perform intentional, illegal acts as articulated in this Complaint. This purported corporation is both as a matter of fact and a matter of law, identical to and indistinguishable from Defendants McMurtry. Since this purported corporate entity is in fact a sham, or dummy, this court should pierce the corporate veil as to it and hold Defendants McMurtry individually liable for such sum or sums as are found to be due and owing Plaintiffs by this fraudulent entity. Such a result is necessary to achieve justice in these proceedings.

2

3. <u>Venue</u> The wrongful acts and omissions complained of herein occurred in the Middle District of Tennessee.

4. <u>Facts</u> The facts set forth in the following paragraphs are made based upon information currently available to the Plaintiffs. The pertinent documents, exact dates, times of illegal transactions, and names of unknown entities are in the exclusive knowledge and control of the Defendants and cannot be discovered in the ordinary course of conduct of the Plaintiffs without the aid of the discovery process as set forth in the Fed. R. Civ. Procedure.

4.1 In the mid-2000's, Defendants McMurtry commenced the formation of a criminal enterprise predicated on racketeering activity within the meaning of 18 USC 1961[1]. Defendants McMurtry commenced this unlawful scheme by the initial use of Defendant CC. The racketeering activity was to be comprised of a series of interlocking unnamed business entities owned and/or controlled by Defendants McMurtry, which would be given the appearance of being sellers in retail of tangible personal property, including but not limited to motor vehicles but in reality were neither more nor less than alter egos of Defendants McMurtry who were in the business of organizing unlawful financing schemes as more fully set out hereinafter. The business entities, including the Defendant CC, would and did hold themselves out as retail sellers but were in reality neither more nor less than conduits for racketeering activity. These unnamed Defendant business entities owned by the McMurtry's directed their sales efforts and advertising at prospective purchasers who did not have good credit ratings and who required immediate, "on the spot" financing of subprime loans arranged by and through Defendants. These business entities routinely took an interest, at the outset, in whatever cash down payment was made by the purchaser. These down payments were usually in the form of oral "side debts". Financing, either

3

through the individual selling entity, as was the case in this Complaint, CC, was arranged in such a way that the indebtedness, other than the side debt, would immediately be sold either to another entity owned and/or controlled by Defendants McMurtry, or to other participating entities such as in this case, Pinnacle Bank, a banking corporation. Multiple and reverse sales of the indebtedness were, and are, an element of the criminal enterprise.

4.2     The racketeering activity was conceived and effectuated by inducing purchasers not only to purchase but also to finance. These inducements were fraudulent in that Defendants created a set of circumstances whereby the vehicle purchasing and financing transaction was designed to give the appearance of a lawful, ordinary transaction but in reality was a fraud expressly intended to make it impossible, as a practical matter, for the purchaser/debtor to make his, her, their, or its correct payments by inducing the purchasers to enter into a sales agreement by offering to accept down payments through oral agreements. These oral agreements were always listed on sales contracts as cash down payments. This scheme was predicated on otherwise lawful sales of the Notes and underlying debt in such a way as to stay ahead of any purchaser/debtor's good-faith payments both on the original note and the side note, and thus create a deficiency. That deficiency created a presumptive right to repossess the collateralized vehicle. This was and is deception and fraud by deed. The racketeering activity was structured in a fashion expressly designed to create confusion and make customer compliance with the payment schedules a practical impossibility, as aforesaid. Once the customer was in default of the oral down payment agreement, the Defendants would repossess the vehicle. These transactions in regards to the Plaintiffs are more fully set forth in the following paragraphs. These transactions themselves and the repossessions and resales connected therewith were not only theft by any definition of either federal or state law but also were *per se* violations of, without limitation, violations of 18 USC

4

891-894; 18 USC 1956; 18 USC 1951; 18 USC 1952 and, ultimately, 18 USC 1957. At all times pertinent, a continuity of relationship existed by and between the Defendants, as set out in this Complaint.

4.3     Defendants McMurtry formed and/or secured control and/or ownership of various sellers, to include CC, by virtue of funds unlawfully and illegally earned by and through the racketeering activity described in this Complaint.

4.4     At a point in time not known to Plaintiffs, Defendants McMurtry approached Pinnacle to determine whether or not Pinnacle would be a buyer for commercial paper generated by the racketeering activity. Pinnacle responded positively, and thereafter became its principal purchaser of commercial paper generated by the racketeering activity described in this Complaint. Pinnacle knew or in exercise of reasonable prudence should have known that the actions of the Defendants as herein described were unlawful. Even armed with that constructive knowledge, Pinnacle continued to buy the commercial paper from the Defendants. Pinnacle, where applicable, relied upon the document internally known as a "Purchase Agreement." (Exhibit A)  Language in that Agreement was to the effect that the seller of the commercial paper in question represented and warranted, *inter alia,* that the receivables were binding obligations of the obligors and that the obligor had no defense, right of set-off, or counterclaim.  Pinnacle, in the exercise of reasonable prudence and diligence, by virtue of its experience in the finance business, should have recognized that the scheme was fraudulent and created for the purpose of perpetrating a fraud on the obligor/customer. Pinnacle, along with the Defendants, profited from the continuous sale of the commercial paper in question. These transactions as they pertain to the Plaintiffs are fully set forth in the following paragraphs.

4.5     On or about May 22, 2013, the Plaintiffs Hamilton entered into an agreement with CC

5

and purchased a 2006 Chevrolet truck from Defendant CC. The down payment was approximately $3000.00, and the remainder of the purchase price was financed through CC. (Exhibit B) At the time the Hamiltons entered into the finance agreement with CC, they were unsophisticated purchasers. The $3000.00 "down payment" listed on Exhibit B was in fact not a "cash" payment but rather was an oral contract entered into between CC and the Hamiltons, the terms of which were, that the Hamiltons would endorse over to CC an insurance check in the amount of $970.53. The remainder of the "cash" down payment would be made after the Hamiltons received the remaining check from their insurance company. This transaction was not evidenced on Exhibit B. On this date the Defendants fraudulently represented to the Hamiltons that they could pay this down payment in this manner and if they did they would keep their truck. No one at CC went over the terms of the agreement with the Hamiltons prior to entering the agreement. The only terms that were generally explained were the amount financed, the amount of the monthly payment and the date the payment was due. CC also informed the Hamiltons that their payments would be made directly to it. At no time did CC explain that it would assign their agreement, or what assigning the agreement to another entity, in this case Pinnacle, meant to the Hamiltons. At no time did the Defendant tell the Hamiltons that the side-note had any effect on the original note. The Hamiltons reasonably relied on the representations made to them by the Defendants in Exhibit B that if they paid their monthly payments they would be complying with the contract terms. Shortly after the purchase, the Hamiltons were told by government authorities that the truck failed emissions testing. The Hamiltons notified CC and CC guaranteed the Hamiltons that appropriate repairs would be made by CC at CC's expense at a CC affiliated repair facility. The Hamiltons approached CC several times about getting their truck repaired but each time CC then would have to schedule a time for the repair. CC never set

6

a time for the Hamiltons to bring the truck into its repair facility. On or about June 22, 2013, the Hamiltons made what they thought was a regular monthly payment in the amount of $427.44 to CC at the CC premises. At the time of this payment the Defendants told them that this payment was a regular monthly payment on the note. However this was a fraudulent misrepresentation. CC applied the note to the side debt. Two days later on June 24, 2013, the Hamiltons received a statement from Pinnacle. (Exhibit C) Unknown to the Hamiltons, CC had sold the Hamiltons' contract to Pinnacle pursuant to their Purchase Agreement. (Exhibit A). The notice set the payment date for the 6th of each month. After this notice the Hamiltons made a timely payment to Pinnacle. (Exhibit D) However, after this payment, on July 25, 2013 the Hamiltons began receiving phone calls from a person at CC identifying herself as "Jessica", demanding the payment that had already been made to Pinnacle. They also received an identical demand from "Jim Maybray", also at CC, who threatened to repossess their truck unless the down payment account was brought current in three days, even though the account was current in all respects. The Hamiltons immediately contacted Pinnacle, speaking to a Frank Howard and Vienitta Jobe, who informed them that, despite CC's assertion, their account was in good standing and not in arrears. The Hamiltons relied on his representation. During this entire time the Hamiltons could not drive the truck because it had not passed emissions inspection. On or about July 28, 2013, the Hamiltons found that their truck was missing and alerted the Nashville Metropolitan Police. The police, after a brief investigation, informed the Hamiltons that the truck had been repossessed by Defendant CC. The Hamiltons immediately called Pinnacle and were again assured that the account was in good standing. When asked why the truck had been repossessed, Pinnacle's Ms. Vienitta Jobe informed the Hamiltons that they needed to contact "Tracy," meaning Defendant Tracy McMurtry. Upon further inquiry, the Hamiltons were told by "Jessica," at CC, that CC had

7

in fact repossessed the truck. In late July 24, 2013, the Hamiltons received a billing statement from Pinnacle. (Exhibit E) The Hamiltons again called Pinnacle's Ms. Job, and was advised by her that the payoff amount was $13,758.10. Ms. Jobe also advised them that on further review, she needed additional information from CC about why the truck had been repossessed. On or about August 8, 2013, Ms. Jobe called the Hamiltons and told them that the correct payoff amount was $15,938.28, and that Pinnacle no longer owned the indebtedness, having sold it back to CC. On or about August 26, 2013, CC informed the Hamiltons by a letter dated August 1, 2013 (Exhibit F) that the payoff was in the amount of $22,367.12, and failure to pay that sum would result in the truck being sold on August 12 if the amount was not paid in full. In fact, the date for the sale for the truck has already passed. On August 28, 2013, the Hamiltons received a Notice from Pinnacle to the effect that the account was past due, even though Pinnacle had known for at least 20 days that CC now held the Note. (Exhibit G)  As a direct result of these deceptive acts of the Defendants, the Hamilton's truck was wrongfully repossessed, and sold, as aforesaid.  This wrongful repossession was directly and proximately caused and permitted by the deceptive and fraudulent use of an oral agreement which was not part of the sale of the underlying commercial paper.  In the Hamiltons case, they made a timely payment on June 22 to CC, which they reasonably believed, based upon representation by McMurtry, was a payment on the note, but CC had already sold their contract/Note to Pinnacle.  Pinnacle then billed them shortly after their payment to CC for another payment.  The Hamiltons then paid that monthly Note directly to Pinnacle on July 3, 2013. Shortly afterward but unknown to the Hamiltons, Pinnacle sold the Note back to CC and by the time the Note was due on August 6, 2014, CC had already repossessed their truck for failure to pay their oral side note.  Then the Defendants sold their truck before evidence that the Hamiltons had received notice of the sale.  And even if the

8

Hamiltons had received adequate notice, the Defendants knew that they did not have the money to pay the entire purchase price. The Hamiltons had paid their installment Notes on time to the entity they were told held their Note. But the Defendants foreclosed against the Hamiltons based upon an oral agreement, which in this case, the Hamiltons had complied with. But instead of using the oral note as grounds for foreclosure, The Defendants used the written agreement, (Exhibit B) claiming the Hamiltons had failed to make timely payments on the note. The sum of $3000.00 listed on the note as "cash" was fraudulent. There was no cash payment and the Defendants were aware of this fact. CC actually had no right to foreclose on the Hamilton's note because it had no lien. Further, CC and Pinnacle sold and resold the Hamiltons contract in such a way that the Hamiltons could not make timely payments to the holder in due course of the Note. Both CC and Pinnacle profited from the sale to each other of the agreement between CC and the Hamiltons. By forcing unsophisticated purchasers like the Hamiltons into a position where their vehicle was repossessed, by the alleged failure to pay an oral side note, fraudulently listed on their sales contract as cash, and for which there was no lien, and by the sale and resale of their Note, as previously set forth, CC and the McMurtrys profited in the following ways: by obtaining a down payment amount that the Hamiltons completely lost; by collecting premiums that did not reduce the debt and could not be recouped; and by collecting portions of premiums paid to third party purchasers of the Note, in this instance Pinnacle; by collecting a repo and GPS fee upon repossession; and by selling the repossessed vehicle for a profit, then still obtaining portions of the agreed contract amount from the Hamiltons. In this transaction, Pinnacle purchased the Hamiltons Note at a 7% reduced price, but continued to collect payments from the Hamiltons on the Note's original amount, then by selling the Note back to Car Credit, at the original Note amount, realized a profit. It is the information and belief of the Plaintiffs that this

9

methodology of transactions between Car Credit, and the McMurtry's other business entities, including Pinnacle, has been a course of business practice for many years previous to the present transaction involving the Hamiltons, which has resulted in huge profits for business entities such as Pinnacle and the McMurtrys. The Plaintiffs reasonably relied on the fraudulent representations by the Defendants that if they paid their monthly Note on time and to the proper party, they would continue to possess their truck, which was a false representation by the Defendants. The Plaintiffs reasonably relied on the representations by the Defendants that the side note repayment would not effect their ability to retain their truck if they made their timely payments, which was a false representation.

5. <u>Violations of the Tennessee Consumer Protection Act</u>  Defendants' individual and collective wrongful, intentional, and fraudulent acts and omissions as aforesaid were and are *per se* deceptive business practices prohibited by TCA 47-18-104[a][27], in that those acts and omissions were acts or practices intentionally deceptive to the consumer.

6. <u>Common Law Fraud</u> Defendants' individual and collective wrongful and intentional acts and omissions as aforesaid were acts of fraud as a matter of fact and as a matter of law. These acts and omissions were intended to mislead and did, in fact, mislead. These acts and omissions were intended not only to benefit the Defendants, individually and collectively, but also to damage the Plaintiffs. Defendants were unjustly enriched at the expense of the Plaintiffs, who reasonably relied on the misrepresentations of the Defendant that if they paid their original Note on time and to the entity indicated by the Defendants, they could possess their truck.

Case 3:14-cv-01542   Document 1   Filed 07/25/14   Page 10 of 35 PageID #: 10

7. <u>Standing</u> Without exception, Plaintiffs are entitled as a matter of law to bring this action. Without exception, each Plaintiff suffered proximate damage as hereinafter set out as a direct consequence of the individual and collective wrongdoing of the Defendants, as aforesaid. The relationship between the injurious conduct alleged and the damages suffered by the Plaintiffs, individually and collectively, is a direct relationship.

7.1    The Defendants, individually and collectively, engaged in activities which directly and indirectly affected interstate commerce within the meaning of 18 USC 1962[c], which activities were racketeering activities as therein defined.

8.    <u>Damages</u> As a direct and proximate result of Defendants' racketeering activities as aforesaid, Plaintiffs, individually and collectively, have suffered economic loss and have been held up to ridicule.

WHEREFORE AND FOR ALL OF WHICH PLAINTIFFS PRAY:

1.    For a money judgment representing compensatory damages against Defendants, jointly and severally, in the collective amount of $6,000,000.00 (Six Million Dollars);

2.    That upon a hearing on the merits, these compensatory damages be trebled, as expressly provided for in 18 USC ¶1964[c] and by the Tennessee Consumer Protection Act;

3.    That upon a hearing on the merits, Plaintiffs be awarded reasonable attorney fees, as expressly provided for in 18 USC ¶1964[c] and by the Tennessee Consumer Protection Act;

4.    That upon a hearing on the merits, this court order the individual Defendants to divest themselves of any direct or indirect interest in the business entities which are Defendants herein, and restrict the individual Defendants from any investment or ownership interest in these or any

11

similar entities engaged in interstate commerce, and dissolve the appropriate entities which are Defendants, as expressly provided for in 18 USC ¶ 1964[a];

5.     That upon a hearing on the merits, Plaintiffs be awarded a money judgment by way of punitive damages against the Defendants, and all of them, in the amount of $10,000,000.00 (Ten Million Dollars);

6.     That upon a hearing on the merits, Plaintiffs be awarded their reasonable expenses of litigation, as provided by law; and,

7.     Plaintiffs demand a jury to resolve the issues joined.

Respectfully Submitted:

/s/ Phillip L. Davidson
Phillip L. Davidson, #6466
Attorney for Plaintiffs
2400 Crestmoor Road, Suite 107
Nashville, TN 37215
(615) 386-7115

/s/ Lawrence D. Wilson
Lawrence D. Wilson, #4076
Attorney at Law
2400 Crestmoor Road
Nashville, Tennessee 37215
(615) 386-7145

12

# PURCHASE AGREEMENT

PURCHASE AGREEMENT ("Agreement"), dated July 27, 2012 between CAR CREDIT, INC ("Seller"), and PINNACLE NATIONAL BANK ("Purchaser"), a corporation organized under the laws of the State of Tennessee.

Seller and Purchaser agree as follows:

1. **PURCHASE AND SALE OF RECEIVABLES AND RELATED ASSETS:** Purchaser purchases from Seller and Seller sells to Purchaser all of Seller's interest in the Receivables identified on Closing Statement attached as Exhibit "A". The term Receivables means;

   a. All debts and obligations, including but not limited to the obligations of any cosigner or guarantor;

   b. All security instruments securing the debts and obligations, including but not limited to mortgages, deeds of trust, and deeds to secure debt;

   c. All instruments and documents evidencing or related to the debts and obligations, including but not limited to credit reports, lien search reports, files, and ledger cards or their computer equivalent;

   d. All policies or certificates of insurance in force on collateral securing any debt or obligation or insuring Seller as the owner of otherwise as a party in interest;

   e. All pending insurance claims and proceeds related to the debts or collateral.

2. **DETERMINATION OF PURCHASE PRICE:** The purchase price for the Receivables is set forth on the Closing Statement attached as Exhibit "A". If after the execution of the Closing Statement, it appears that an error occurred in computation of the purchase price, the party owing the amount that will correct the overpayment or underpayment, as the case may be, must promptly pay such amount to the other party upon submission of reasonable evidence of such error.

3. **DETERMINATION OF DISCOUNT AND USE OF FUNDS:** The discount amount is computed based on the risk characteristics, market values and other factors of the receivables and is set forth on the Closing Statement attached as Exhibit "A". This amount will be deposited in an interest bearing money market account at Pinnacle National Bank (RESERVE FUND) owned jointly by the Purchaser and Seller. These funds will be used for any unforeseen contingencies as determined by the Purchaser and Seller and mutually agreed to on a monthly basis. The Purchaser will provide detailed information concerning the activity in the Reserve Fund and the related Receivables on a periodic basis.

4. **ADDITIONAL RESERVE FUND SETTLEMENT:** Additional Reserve Fund allocations may be made by the Seller at any time. Any additional allocation made associated with this agreement will be deducted from the net settlement and deposited in the Reserve Fund account at Pinnacle National Bank as set forth on the Closing Statement attached as Exhibit "A".

Case 3:14-cv-01542   Document 1   Filed 07/25/14   Page 13 of 35 PageID #: 13

5. **CREDIT-RELATED INSURANCE and OTHER ADD ONS:** Seller has not sold any credit related insurance or after market add ons in connection with the Receivables; therefore, no provisions need be made for this.

6. **REPRESENTATIONS AND WARRANTIES OF SELLER; REPURCHASE OBLIGATION:**

   a. Seller represents and warrants to Purchaser that:

      i. Seller is the sole owner of the Receivables, free and clear of any liens or other claims;

      ii. The Receivables are valid and binding obligations of the obligors, enforceable according to their respective terms, except as may be limited by bankruptcy or receivership;

      iii. No obligor has a defense, right of set-off, or counterclaim against the seller;

      iv. There are no written or oral agreements that vary any of the terms of the Receivable, except as set forth in the documents constituting the Receivables;

      v. No Receivable is, on the closing date, sixty days or more contractually past due, in bankruptcy, had any property repossessed, in litigation, a "skip", or a judgment account;

      vi. All information concerning the Receivables and the obligors thereon is truly and completely described in the books, records, files, cards and other documents of the Receivables. Information supplied by obligors or other third parties is true and complete to Seller's best knowledge.

      vii. All liens included in the Receivables are valid, perfected first or second liens on the property described;

      viii. The Receivables comply with all applicable state and federal law, including but not limited to the Federal Consumer Credit Protection Act ("Truth-in-Lending") and Regulation Z, and the Federal Equal Credit Opportunity Act and Regulation B; and

   b. If any of the foregoing warranties and representations are breached, Seller must, upon demand, immediately repurchase from Purchaser any Receivable with respect to which a warranty or representation was breached. The repurchase price of Receivable is 100% of the unpaid balance owing on the contract at the time of the repurchase;

   c. If the installment first scheduled for payment on or after the date of this Agreement, with respect to any of the Receivables, is not timely paid in full by the obligor thereon, Seller shall, promptly upon Purchaser's demand within 60 days of the payment's due date, repurchase such Receivable from Purchaser for cash in the full amount of the purchase price paid for such Receivable by Purchaser to Seller under the Agreement.

   d. With respect to bankruptcy, default as a result of no contact with the Receivable, seizure by law enforcement within the first 120 days after the purchase date the Seller must, upon demand, repurchase the Receivable with respect to this default provision. The repurchase price of Receivable is 100% of the unpaid balance owing on the contract at the time of the repurchase

Case 3:14-cv-01542   Document 1   Filed 07/25/14   Page 14 of 35 PageID #: 14

7. **SELLER'S AUTHORITY:** Seller represents and warrants to Purchaser that:

   a. This Agreement is enforceable against Seller in accordance with its terms; and

   b. The signing and delivery by Seller of, and performance of, this Agreement do not:

      i.   Violate the articles of Incorporation or bylaws of Seller;

      ii.  Breach or result in a default under any existing contractual obligation of Seller; or

      iii. Violate or breach any statute, judicial or administrative decree, order, or ruling applicable to Seller or to the Receivables.

8. **REPRESENTATIONS AND WARRANTIES OF PURCHASER:** Purchaser represents and warrants to Seller that:

   a. This Agreement is enforceable against Purchaser in accordance with its terms; and

   b. The signing and delivery by Purchaser of, and the performance of its agreements in, this Agreement do not:

      i.   Violate the articles of incorporation or bylaws of Purchaser;

      ii.  Breach or result in a default under any existing contractual obligation of Purchaser; or

      iii. Violate or breach any statue, judicial or administrative decree, order, or ruling applicable to Purchaser or to the Receivables.

9. **DELIVERIES BY SELLER:** Seller must deliver to Purchaser at the closing (except as may be specifically waived in writing by the Purchaser):

   a. The Receivables listed on Exhibit "A";

   b. If Seller is a corporation, a certified copy of a corporate resolution, Substantially in the form of Exhibit "B";

   c. An Assignment and Power of Attorney substantially in the form of Exhibit "C";

   d. Any necessary and proper documents to assign to Purchaser Seller's interest in property securing the Receivables.

10. **COVENANTS OF SELLER:** Seller covenants as follows:

    a. From the date of the closing, Seller will warrant and defend the title of Purchaser to all of the Receivables. Upon request of Purchaser, Seller at its own expense will do, execute, acknowledge and deliver such instruments and other documents as may be reasonably required to carry out any of the provisions of this Agreement.

    c. All sums received by or on behalf of Seller after the date of the closing in payment of the Receivable are received for the account of Purchaser and will be promptly paid over to Purchaser by Seller.

11. **PURCHASER'S SUBSIDIARIES:** Purchaser may designate one or more of its subsidiaries as the Buyer of any Receivable, and the word "Purchaser" as used in this Agreement, whenever applicable, will include the subsidiary; but, Purchaser is responsible for the performance of this Agreement.

12. **NO BROKERS:** Seller and Purchaser represent and warrant to each other that their respective employees or attorneys negotiated this transaction; no person is entitled to any brokerage commission, finder's fee, adviser's fee or like payment.

13. **NATURE AND SURVIVAL OF REPRESENTATIONS, ETC.:** All representations and warranties contained in this Agreement will survive after the date of the closing.

14. **COSTS AND EXPENSES:** Purchaser and Seller must pay their individual costs and expenses incurred in connection with this transaction, including without limitation, fees and disbursements of their respective professional advisers. Neither party has any recourse, right of offset or other claim against the other for those costs and expenses.

15. **INDEMNITY:** Seller agrees to defend, indemnify, and hold harmless Purchaser and its respective parents, officers, directors, employees, successors and assigns against any and all losses, damages, claims, suits, proceedings, liabilities, costs and expenses, including reasonable attorneys fees incurred by reason of any representation or warranty made by Seller in or in connection with this Agreement having been untrue or, incorrect in any respect when made or deemed made, or the breach by Seller of any covenant or agreement made by it in this Agreement, or by reason of any action or proceeding being instituted by any person based upon allegation or assertion which, if true, would indicate the existence of any of the above circumstances.

16. **CONFIDENTIALITY AND NON-SOLICITAITON:** Neither Seller nor any of its directors, officers, affiliates, employees, agents or representatives may disclose, directly or indirectly, any information concerning the Receivables, other than information that was previously available to the public, or as required by law or regulation. Further, Seller, its directions, officers, affiliates and employees may not solicit any such obligor for the purpose of making a loan or financing a retail sale or lend any money to or finance any sale to said obligors for a period of twenty four (24) months from the execution of this Agreement.

17. **NOTICES:** All notices and other communications under this Agreement will be in writing and will be deemed to have been duly given if delivered or mailed first class, postage prepaid:

    a.  If to Purchaser, to:    **Pinnacle National Bank**
                                    **150 3rd Avenue South – Ste 900**
                                      **Nashville, TN 37201**
                                      **Attention: Hugh M. Queener**

or to Purchaser at such other address Purchaser will have furnished in writing to Seller;

    b.  If to Seller, to:      **Car Credit, Inc.**
                                     **3823 Dickerson Road**
                                       **Nashville, TN 37207**
                                       **Attention: Tracy McMurtry**

or to Seller at such other address as Seller will have furnished in writing to Purchaser.

18. **SPECIFIC PERFORMANCE:** Purchaser and Seller recognize that each may be irreparably damaged if this Agreement is not specifically enforced and , therefore, agree that any right or obligation under this Agreement is enforceable in a court of equity by a decree of specific performance. Such remedy, however, is cumulative and not exclusive of any other remedy at law or equity.

19. **ENTIRE AGREEMENT:** This Agreement and all documents delivered pursuant to this Agreement constitute the entire agreement between the parties. Any amendment of this Agreement is ineffective unless in writing signed by both Purchaser and Seller.

20. **WAIVERS:** Any waiver of any term of this Agreement is ineffective unless granted in writing singed by the party entitled to the performance of such term. A waiver of any term of this Agreement by any party is not a waiver by such party of any other term under this Agreement nor will a waiver of any breach of a term, condition or obligation constitute a waiver of a subsequent breach of the same term, condition or obligation or of any of its attendant rights.

21. **SEVERABILITY:** If a court holds that any provision of this Agreement is for any reason invalid, the provision must be enforced to the extent to which it is valid; the parties may enforce the remaining provisions of this Agreement as written, unless enforcement is in manifest violation of the present intention of the parties reflected in the Agreement.

22. **COUNTERPARTS:** The parties may sign this Agreement in one or more counterparts; each counterpart is an original but all are deemed to be the same instrument.

23. **SUCCESSORS:** This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective successors and assigns.

24. **ARBITRATION:** Any controversy or claim arising out of or relating to this agreement or the breach thereof, shall be settled by arbitration administered by the American Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Any arbitration proceeding provided for by this section shall take place in

Case 3:14-cv-01542    Document 1    Filed 07/25/14    Page 17 of 35 PageID #: 17

Agreed to this ▬▬▬▬▬▬▬.

**Seller:**
**Car Credit, Inc.**

By: _~Tracy D McMurtry~_ (Typed or Printed) Tracy McMurtry

**Purchaser:**
**Pinnacle National Bank**

By: _~Hugh Queener~_ (Typed or Printed) Hugh M. Queener

Its: Executive Vice President and Chief Administrative Officer
     (Title)

EXHIBIT "B"

## ASSIGNMENT AND POWER OF ATTORNEY

THIS ASSIGNMENT AND POWER OF ATTORNEY ("Assignment") is made as of the ____day o̶f̶ ▓▓▓▓▓ ▓▓▓ by __CAR CREDIT__ ("Seller") pursuant to the terms of a Dealer Master Purchase Agreement dated _____, 20___ (the "Agreement") by and between Seller and PINNACLE BANK as Purchaser. All defined terms not otherwise defined in this Assignment shall have the meaning assigned to such terms in the Agreement.

For and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Seller does hereby assign to Purchaser all of Seller's interest in and the Receivables listed on Exhibit "A" attached hereto.  For the purpose of collecting, receiving, releasing, endorsing, assigning, and otherwise enjoying the full rights, privileges and benefits which Seller has heretofore had, Seller hereby names, constitutes and appoints _____ as Purchaser, along with any of its authorized agents, employees or representatives, its duly authorized attorney and agent solely with respect to such Receivables, with full power and authority to endorse or assign notes or security instruments in Seller's name; to receive and collect any and all monies due and payable under said Receivables; to enforce performance of all contracts and instruments covered thereby and for such purposes, to institute suit in its own name; to effect repossession of chattels or to use any other methods or means which _____ as Purchaser finds necessary to effect collection and performance; to release any and all liens and instruments of record; to amend, supplement or replace such instruments with other like or similar instruments to extend and modify periods and time of payment; and generally, to do and perform any and all things necessary and incident in the premises, with equal rights, privileges and powers which the Seller has had or was entitled to exercise as the owner of said Receivables.

Seller further grants to _____ the limited power of substitution and revocation of another party for the purpose and only for the purpose of endorsing or assigning notes or security instruments in Seller's name, and hereby ratifying and confirming all that the attorney in fact, or a substitute or substitutes, shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers.

Tracy D. McMurty
(Typed or Printed Name)

# ACKNOWLEDGMENT

STATE OF: _Tennessee_
COUNTY OF: _Davidson_

Before me, a Notary Public of said State and County aforesaid, personally appeared _Tracy D McMurtry_, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath acknowledged him/herself to be _____ of _____, a _____, the bargainor, and that he/she as such _____, being duly authorized to do so, executed the foregoing instruments for the purpose therein contained, by signing the name of the _____ by him/herself as such _____.

Witness my hand at office in _Nashville_ , Tennessee, this ▇▇ day of ▇▇▇▇▇, 20 ▇▇.

_Pamela Msutton_
(Notary Public)

My Commission Expires: _____

My Commission Expires
Nov. 04. 2012

RETAIL INSTALLMENT SALE CONTRACT
SIMPLE FINANCE CHARGE

600346280    B

STOCK # R293471    Dealer Number _____    Contract Number _____

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| MICHAEL HAMILTON 2405 EMMETT AVE NASHVILLE, TN 37206 DAVIDSON | JUANITA HAMILTON 2405 EMMETT AVE NASHVILLE, TN 37206 DAVIDSON | CAR CREDIT, INC. 3819 DICKERSON PIKE NASHVILLE, TN 37207-1317 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| U | 2006 | CHEVROLE SILVERAD | 2GCEC13V061293471 | ☒ personal, family or household ☐ business ☐ agricultural ☐ _____ |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 3000.00 is |
|---|---|---|---|---|
| 22.00 % | $ 7071.74 | $ 13445.38 | $ 20517.12 | $ 23517.12 |

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 48 | 427.44 | Monthly beginning 07/06/2013 |
| Or As Follows: | | |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of $ 1.00 or 5 % of the part of the payment that is late, whichever is greater.
Prepayment. If you pay off all your debt early, you will not have to pay a penalty.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1 Cash Price (including $ 1196.38 sales tax) + business tax | $ 16445.38 | (1) |
| 2 Total Downpayment = | | |
| Trade-in _____ (Year) _____ (Make) _____ (Model) | | |
| Gross Trade-In Allowance | $ n.a. | |
| Less Pay Off Made By Seller | $ n.a. | |
| Equals Net Trade In | $ n.a. | |
| + Cash | $ 3000.00 | |
| + Other | $ n.a. | |
| (If total downpayment is negative, enter "0" and see 4I below) | $ 3000.00 | (2) |
| 3 Unpaid Balance of Cash Price (1 minus 2) | $ 13445.38 | (3) |
| 4 Other Charges Including Amounts Paid to Others on Your Behalf (Seller may keep part of these amounts): | | |
| A Cost of Optional Credit Insurance Paid to Insurance Company or Companies. | | |
| Life | $ n.a. | |
| Disability | $ n.a. | $ n.a. |
| B Vendor's Single Interest Insurance Paid to Insurance Company | | $ n.a. |
| C Other Optional Insurance Paid to Insurance Company or Companies | $ n.a. | |
| D Optional Gap Contract | | $ n.a. |
| E Official Fees Paid to Government Agencies | | $ n.a. |
| F Government Taxes Not Included in Cash Price | | $ n.a. |
| G Government License and/or Registration Fees LIC 0.00 REG 0.00 | | $ n.a. |
| H Government Certificate of Title Fees | | $ n.a. |
| I Other Charges (Seller must identify who is paid and describe purpose) | | |
| to _____ for Prior Credit or Lease Balance | $ n.a. | |
| to _____ for _____ | $ n.a. | |
| to _____ for _____ | $ n.a. | |
| to _____ for _____ | $ n.a. | |
| to _____ for _____ | $ n.a. | |
| to _____ for _____ | $ n.a. | |
| Total Other Charges and Amounts Paid to Others on Your Behalf | $ n.a. | (4) |
| 5 Amount Financed (3 + 4) | $ 13445.38 | (5) |

OPTIONAL GAP CONTRACT. A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ n.a. _____ Mos.

### Insurance.
You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the Insurance you want and sign below:

#### Optional Credit Insurance

☐ Credit Life:  ☐ Buyer  ☐ Co-Buyer  ☐ Both
☐ Credit Disability (Buyer Only)
Premium:
Credit Life $ _____ n.a.
Credit Disability $ _____ n.a.
Insurance Company Name _____ n.a.
Home Office Address _____ n.a.

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not to buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

#### Other Optional Insurance

☐ _____ n.a. _____ n.a.
Type of Insurance _____ Term
Premium $ _____ n.a.
Insurance Company Name _____ n.a.
Home Office Address _____ n.a.

☐ _____ n.a. _____ n.a.
Type of Insurance _____ Term
Premium $ _____ n.a.
Insurance Company Name _____ n.a.
Home Office Address _____ n.a.

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____
Buyer Signature _____ Date

X _____
Co-Buyer Signature _____ Date

THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT THIS INSURANCE YOU MAY NOT HAVE COVERAGE FOR INSURANCE REQUIRED TO OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS.

## 1. FINANCE CHARGE AND PAYMENTS

**a. How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

**b. How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

**c. How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

**d. You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

## 2. YOUR OTHER PROMISES TO US

**a. If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

**b. Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

**c. Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods installed in it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

**d. Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge at the Annual Percentage Rate shown on the front of this contract.
If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e. What happens to returned insurance, maintenance, service or other contract charges.** If we get a refund of insurance, maintenance, service or other contract charges, you agree that we may subtract the refund from what you owe.

## 3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES

**a. You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

**b. You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
- You do not pay any payment on time;
- You give false, incomplete, or misleading information on a credit application;
- You start a proceeding in bankruptcy or one is started against you or your property; or
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

**c. You may have to pay collection costs.** If we hire an attorney to collect what you owe, you will pay the attorney's fee and court costs as the law allows. You will also pay any collection costs we incur as the law allows.

**d. We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

**e. How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

**f. We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

**g. What we may do about optional insurance, maintenance, service or other contracts.** This contract may contain charges for optional insurance, maintenance, service or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

## 4. WARRANTIES SELLER DISCLAIMS

**Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.**
This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

## 5.

**Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**

**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma**

2 Total Downpayment =

Trade-in _____ _____ _____
    (Year)     (Make)     (Model)

| | | |
|---|---|---|
| Gross Trade-in Allowance | $ | n. a. |
| Less Pay Off Made By Seller | $ | n. a. |
| Equals Net Trade In | $ | n. a. |
| + Cash | $ | 3000.00 |
| + Other | $ | n. a. |

(If total downpayment is negative, enter "0" and see 4I below)    $ 3000.00 (2)

3 Unpaid Balance of Cash Price (1 minus 2)    $ 13445.38 (3)

4 Other Charges Including Amounts Paid to Others on Your Behalf
  (Seller may keep part of these amounts):

| | | |
|---|---|---|
| A Cost of Optional Credit Insurance Paid to Insurance Company or Companies. | | |
|    Life | $   n. a. | |
|    Disability | $   n. a. | $   n. a. |
| B Vendor's Single Interest Insurance Paid to Insurance Company | | $   n. a. |
| C Other Optional Insurance Paid to Insurance Company or Companies | | $   n. a. |
| D Optional Gap Contract | | $   n. a. |
| E Official Fees Paid to Government Agencies | | $   n. a. |
| F Government Taxes Not Included in Cash Price | | $   n. a. |
| G Government License and/or Registration Fees | | $   n. a. |
|    LIC   0.00   REG   0.00 | | |
| H Government Certificate of Title Fees | | $   n. a. |
| I Other Charges (Seller must identify who is paid and describe purpose) | | |

| to | for Prior Credit or Lease Balance | $   n. a. |
|---|---|---|
| to | for | $   n. a. |
| to | for | $   n. a. |
| to | for | $   n. a. |
| to | for | $   n. a. |
| to | for | $   n. a. |

Total Other Charges and Amounts Paid to Others on Your Behalf    $ n. a. (4)

5 Amount Financed (3 + 4)    $ 13445.38 (5)

**OPTIONAL GAP CONTRACT.** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ n. a. _____ Mos.      n. a.
                                Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

**☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance):** If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. **You may choose the insurance company through which the VSI insurance is obtained.** If you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ _____ n. a. _____, and is also shown in Item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

**OPTION:** ☐ You pay no finance charge if the Amount Financed, Item 5, is paid in full on or before _____ n. a. _____, _____ Year _____, SELLER'S INITIALS _____

### NO COOLING OFF PERIOD

State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.   Buyer Signs X *Michael Hamilton*   Co-Buyer Signs X *Juanita Hamilton*
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
See back for other important agreements.

**NOTICE TO RETAIL BUYER: Do not sign this contract in blank. You are entitled to a copy of the contract at the time you sign. Keep it to protect your legal rights.**

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it. 05/22/2013

Buyer Signs X *Michael Hamilton* Date 05/22/2013   Co-Buyer Signs X *Juanita Hamilton* Date

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other person agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____

Seller signs   CAR CREDIT, INC.    05/22/2013 Date   By _____ Title _____

Seller assigns its interest in this contract to   CAR CREDIT, INC.    (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse     CAR CREDIT, INC.     ☐ Assigned without recourse     ☐ Assigned with limited recourse

Seller _____ By _____ Title _____

Right column:

Other Optional Insurance

☐   n. a.     n. a.
Type of Insurance     Term
Premium $   n. a.
Insurance Company Name   n. a.
Home Office Address   n. a.

☐   n. a.     n. a.
Type of Insurance     Term
Premium $   n. a.
Insurance Company Name   n. a.
Home Office Address   n. a.

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____
Buyer Signature     Date

X _____
Co-Buyer Signature     Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT SUCH INSURANCE YOU MAY NOT OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS.**

X _____
Buyer Signature

X _____
Co-Buyer Signature

Returned Check Charge: You agree to pay a charge of $   30.00   if any check you give to us is dishonored.

may not pay all you owe on this contract if you make late payments. Credit disability insurance will not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

FORM NO. 553-TN

You give us a security interest in:

- The vehicle and all parts or goods installed in it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

**d.  Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge at the Annual Percentage Rate shown on the front of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e.  What happens to returned insurance, maintenance, service or other contract charges.** If we get a refund of insurance, maintenance, service or other contract charges, you agree that we may subtract the refund from what you owe.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

**g.  What we may do about optional insurance, maintenance, service or other contracts.** This contract may contain charges for optional insurance, maintenance, service or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**4.  WARRANTIES SELLER DISCLAIMS**
Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.
This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

**5.  Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

**6.  Applicable Law**
Federal law and the law of the state of Tennessee apply to this contract.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-TN 2/08



## Credit Application - Auto Loan

Trade / Down Payment



**3819 Dickerson Rd.**
**Nashville, TN 37207**
**615-865-4346 Fax: 615-865-4346**

### Applicant Information

| | | |
|---|---|---|
| Name: Michael Hamilton | Email | |
| Home Phone 615-227-9217 | Work Phone | Cell Phone 615-569-8780 |
| Date of Birth 7-09-44 | Social Security Number 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 | Drivers License Number 028666659 |

| Marital Status: | Unmarried (single, divorced, widowed) | Married ✓ | Separated | No. of Dependents 0 |
|---|---|---|---|---|

| Length of Time at Current Address: Years / Mo 24 years | | Length of Time at Previous Address Years / Months 10 yrs |
|---|---|---|

| Current Residence Address 2405 Emmett Ave. | Previous Residence Address |
|---|---|

| City Nashville | State TN. | Zip Code 37206 | City | State | Zip Code |
|---|---|---|---|---|---|

| Own ✓ | Rent | House | Apt. | Landlord / Mortgage Co. U.S. Bank | Length of Time at Years / Months Phone Number |
|---|---|---|---|---|---|

| Current Employer Retired | | Length of Time at Current Employer: Semi-Retired | Years / Months |
|---|---|---|---|

| Current Employer Address | City | State | Zip Code |
|---|---|---|---|

| Job Title | Supervisor | Phone Number |
|---|---|---|

| Income Gross $'s 711.00 | Annual | Monthly ✓ | Weekly | Biweekly | Additional Income 600.00 | Source maintenance + brick work |
|---|---|---|---|---|---|---|

| Previous Employer | | Length of Time at Previous Employer: | Years / Months |
|---|---|---|---|

### Co-Applicant Information

| | | |
|---|---|---|
| Name: Juanita Hamilton | Email | |
| Home Phone 615-227-9217 | Work Phone | Cell Phone 615-977-4775 |
| Date of Birth 7-13-46 | Social Security Number 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 | Drivers License Number 032961258 |

| Current Employer Retired | | Length of Time at Current Employer: | Years / Months |
|---|---|---|---|

| Current Employer Address | City | State | Zip Code |
|---|---|---|---|

| Job Title | Supervisor | Phone Number |
|---|---|---|

| Income / Gross $'s 372.00 | Annual | Monthly ✓ | Weekly | Biweekly | Additional Income 292.00 | Source Housework |
|---|---|---|---|---|---|---|

I/We hereby apply for the loan or credit described in this application. I/We certify that I/we made no misrepresentations in this loan application or in any related documents, that all information is true and complete, and that I/We did not omit any important information. I/We agree that any property securing the loan or credit will not be used for any illegal or restricted purpose. Lender is authorized to verify with other parties and to make any investigation of my/our credit, either directly or through any agency employed by Lender for that purpose. Lender may disclose to any other interested parties information as to Lender's experiences or transactions with my/our account. I/We understand that Lender will retain this application and any other credit information Lender receives, even if no loan or credit is granted. These representations and authorizations extend not only to Lender, but also to any insurer of the loan and to any investor to whom Lender may sell all or any part of the loan. I/We further authorize Lender to provide to any such insurer or investor any information and documentation that they may request with respect to my/our application, credit or loan.

X _Michael Hamilton_ Date _____  X _Juanita Hamilton_ 5-22-2a
Applicant                              Co-Applicant                              Date

REORDER FROM INTERNATIONAL OFFICE PRODUCTS - FORM#: CCCA-101 - 615-578-7888

**RETAIL BUYERS ORDER** · Car Credit Inc. · 3819 Dickerson Rd. · Nashville, TN 37207 (615)865-4346 Fax (615)865-4305

PURCHASER: MICHAEL HAMILTON OR JUANITA HAMILTON    DATE 5/22/2013    SALESMAN R/RED

ADDRESS 405 EMMETT AVE    HOME PHONE 615/227-9217

CITY NASHVILLE    STATE TN    ZIP 37206    WORK PHONE 615/569-8780

I hereby agree to purchase from you under the terms and conditions specified:

☐ NEW    YEAR 2006    MAKE CHEVROLET    MODEL SILVERADO    STOCK NO. 293471

X ☐ USED    COLOR RED    MILEAGE 89939    SERIAL NO. 2GCEC13V061293471

Delivery of this purchase is to be made by    05/22/2013    20 _____    BODY: CREW

| SOLD AS IS | | |
|---|---|---|
| PRICE | 14950 | 00 |
| Trade-In Allowance | | |
| Trade Difference | | |
| Cash Payment | | |

X *Michael Hamilton*    *Juanita Hamilton*

INSURANCE COMPANY: _____

Name: _____

Address: _____

City: _____

State: _____ Zip: _____

Phone: _____

Credit O.K. _____

Finance Co. _____

CAR CREDIT, INC.
3819 DICKERSON PIKE
NASHVILLE, TN 37207-1317

| | | |
|---|---|---|
| Term Sales Tax | 1114 | 63 |
| County Tax | 36 | 00 |
| Gross Receipt Tax | 45 | 75 |
| License & Title | | |
| Filing, Notary & Documentary Fee | 299 | 00 |
| TOTAL PRICE | 16445 | 38 |

| Used Car Allowance $ | Balance Owed | Equity | |
|---|---|---|---|
| Balance Owed To | | | |
| Address | | | |
| Year | Make | Model | Color |
| Serial No. | | Mileage | |
| Cash on Delivery | | 3000.00 | 3000.00 |
| Total Down Payment | MONTHLY | 3000.00 | 3000.00 |
| Balance in 48 @ $27 | Beginning 07/06/2013 | Amount To Be Financed | 13445.38 |

The information you see on the window form (Buyer's Guide) for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

Purchase expressly agrees that title to the motor vehicle being purchased hereunder shall remain in Franklin Motor Co. until any check or checks tendered in whole or in part payment for this purchase shall have been paid by the bank or banks, on which drawn.

My age is over 18 and I make this true statement in order to buy this car.

This notice is provided with requirements of the Federal Fair Credit Reporting Act.

This instrument compromises the entire agreement pertaining to the purchase of the within described vehicle and no other agreement, verbal or otherwise, shall be recognized. This order is not binding upon dealer or purchaser, unless a cash transaction, until purchaser's application for credit has been approved by a responsible bank or finance company as to any unpaid balance. Upon such approval and acceptance of the disclosers required, by the truth and lending act by buyer this shall become binding.

*Michael Hamilton*    *Juanita Hamilton*    TN 028666659
Buyer's Signature    TN 032961258    Driver's License Number
ALL ORDERS SUBJECT TO MANAGEMENT APPROVAL    REORDER FROM INTERNATIONAL OFFICE PRODUCTS  FORM#: RBO 007  615 578 7986

# CUSTOMER DISCLOSURE STATEMENT

Dear Customer: the vehicle you are purchasing is equipped with a state-of-the-art GPS device that will help protect your vehicle from theft, and will help in the recovery of your vehicle should it be stolen. The lender (lienholder) of your vehicle has required the installation of the device as a condition of approving your loan and maintaining your loan. The device is being installed at no cost to you and will remain the property of the lender (lienholder). When your installment purchase contract has been paid in full, the device will be removed at no cost to you by the lender (lienholder), or the device may be purchased by you as an anti-theft device for $395. You can choose whether the device remains on your vehicle or not. You may qualify for a discount on your comprehensive insurance by keeping the device on your vehicle. Your insurance company can tell you whether or not you are eligible for a premium discount.

If you tamper, alter, disconnect or remove this device from your vehicle, the lender (lienholder) has the right to REPOSESS YOUR VEHICLE. Removing or tampering with this device is a CRIME FOR WHICH YOU MAY BE PROSECUTED!

By signing this Disclosure Statement, you are saying that you are aware that this device is on your vehicle, and that you give the lender (lienholder) permission to place the device on your vehicle. You also understand that if you do not make your agreed-upon payments to the lender (lienholder), the lender (lienholder) has a right to take whatever means are permissible by law to repossess the vehicle. The lender (lienholder) can completely turn the vehicle OFF; whereby you could not drive the vehicle, should that be necessary.

Please read and initial each of the following statements

___ _J.H._ I have read and received a copy of this disclosure statement.

___ _J.H._ I understand and agree that a GPS starter-interrupt/recovery device has been installed in the vehicle I am purchasing.

___ _J.H._ I understand and agree that the device belongs to the lender (lienholder).

___ _J.H._ I understand and agree that keeping the GPS starter-interrupt/recovery device in any vehicle is a condition of my receiving this loan.

___ _J.H._ I understand and agree that tampering with, disconnecting, or removing the device shall be considered a default, and that the lender (lienholder) will take whatever means necessary to repossess the vehicle.

___ _J.H._ I understand and agree that if I default on any of my contractual commitments, or do not make a scheduled payment, the lender (lienholder) can REPOSSESS MY VEHICLE in accordance with the loan agreement and state law.

REORDER FROM INTERNATIONAL OFFICE PRODUCTS - FORM#: CDS-1001 - 615-578-7988

# CUSTOMER DISCLOSURE STATEMENT

*M rt J.H.* I understand and agree that should the vehicle be disabled, as a result of non-payment by me, or because I tampered with, altered, disconnected, or removed the device, that I do hereby release and hold harmless, the lender (lienholder), from any and all liability or damages that I may suffer as a result of not being able to drive my vehicle, including, but not limited to, lost wages, economic benefit, loss of compensation, any incidental and consequential damages that may accrue on account of foreseen or unforeseen bodily and personal injuries and property damages, and I do release and discharge lender (lienholder) and their heirs, successors, and assigns from all claims, demands, actions or causes of actions resulting therefrom. I agree to indemnify lender (lienholder) for any money it may have to pay to any other person or entity asserting any claims arising out of or related to any injuries or damages that may result from the actions described above, including any expenses incurred in defending such claims.

*M H J.H.* I understand and agree that only the lender (lienholder), and their representatives are authorized to execute maintenance on the device and if repairs are required, I agree to bring the vehicle to the dealer for repairs during their normal business hours.

*M H J.H.* I understand that the vehicle will NOT be disabled when the vehicle is in motion (moving).

I have read, received a copy of, and completely understand each of these statements that I have initialed, and agree to do what they say.

_Michael Hamilton_  
Customer       Date

_Jennifer Hamilton_ Col CREDIT  
Lender (Lienholder)     Date

_____ 5·22·13  
Witness       Date





```
***************AUTO**3-DIGIT 372
598 0.8402 AT 0.384      3 1 73
||||.|||.|.|||.|...|.|.|...||.||.|.|..|.||..|.|..|...|
Michael Hamilton
Juanita Hamilton
2405 Emmett Ave
Nashville TN  37206-3311
```

### Loan Billing Statement

====================================================================
Questions about your statement? Call 615.744.3700 or 800.264.3613

====================================================================

Consumer Mthly Pymt Loan 600346280

====================================================================

| Date | Description | -----Payment Split----- Principal    Interest | Transaction Amount | Principal Balance |
|------|-------------|----------------------------------------------|--------------------|-------------------|
| 05/22/2013 | Initial Loan Advance |  | 13,445.38 | 13,445.38 |
| 06/21/2013 | Balance This Statement |  |  | 13,445.38 |

- - - - - - - - - I n t e r e s t   C a l c u l a t i o n - - - - - - - - - -

| From Date | Thru Date | Interest Rate | Daily Periodic Rate | Principal | Days | Accrued Interest |
|-----------|-----------|---------------|---------------------|-----------|------|------------------|
| 05/22/2013 | 07/05/2013 | 22.0000 % | .00060273 | 13,445.38 | 45 | 364.68 |

- - - - - - - - - - - - - - -L o a n   S u m m a r y - - - - - - - - - - - - -

Collateral/Property: 2006 Chevrolet Silverado Truck

| | |
|---|---|
| Credit Limit: | Interest Accrued From:      05/22/2013 |
| Available Credit: | Interest Accrued Thru:      07/05/2013 |
| Maturity Date:          06/06/2017 | Principal Due:                  62.76 |
| - - - - Activity This Period - - - - | Interest Due:                 364.68 |
| Principal Advances:        13,445.38 | Total Payment Due:            427.44 |
| | Payment Due Date:        07/06/2013 |
| Interest Accrued:           364.68 | |

Add additional late charge of 21.37 if no payment is received by 07/16/2013



Case 3:14-cv-01542   Document 1   Filed 07/25/14   Page 29 of 35 PageID #: 29

⑆064008637⑈        ⁊⁊⁅

# Pinnacle™

www.pnfp.com

18100

```
100 Oake
928    156 07/03/13   17:03
Loan Payment
Acct# XXXX46280           $427.44
```

We appreciate your business!





```
****************************SNGLP
155 0.8402 SP 0.460     1 1 155

Michael Hamilton
Juanita Hamilton
2405 Emmett Ave
Nashville TN  37206-3311
```

Loan Billing Statement
=====================================================================
Questions about your statement? Call 615.744.3700 or 800.264.3613

=====================================================================
Consumer Mthly Pymt Loan 600346280
=====================================================================

| Date | Description | -----Payment Split----- Principal | Interest | Transaction Amount | Principal Balance |
|------|-------------|-----------|----------|-------------|-------------------|
| 06/21/2013 | Balance Last Statement | | | | 13,445.38 |
| 07/03/2013 | Regular Payment | 87.07 | 340.37 | 427.44 | 13,358.31 |
| 07/23/2013 | Balance This Statement | | | | 13,358.31 |

- - - - - - - - - - - I n t e r e s t   C a l c u l a t i o n - - - - - - - - - -
| From Date | Thru Date | Interest Rate | Daily Periodic Rate | Principal | Days | Accrued Interest |
|-----------|-----------|---------------|---------------------|-----------|------|------------------|
| 07/06/2013 | 08/05/2013 | 22.0000 % | .00060273 | 13,358.31 | 31 | 249.59 |
| Accrued Interest Adjustment: | | | | | | .15- |

- - - - - - - - - - - - - - L o a n   S u m m a r y - - - - - - - - - - - - - -
Collateral/Property: 2006 Chevrolet Silverado Truck
Credit Limit:                              Interest Accrued From:       07/06/2013
Available Credit:                          Interest Accrued Thru:       08/05/2013
Maturity Date:            06/06/2017       Principal Due:                  153.69
- - - - Activity This Period - - - -       Interest Due:                   273.75
Principal Paid:                 87.07      Total Payment Due:              427.44
Interest Paid:                 340.37      Payment Due Date:            08/06/2013

Interest Accrued:              249.59

Add additional late charge of 21.37 if no payment is received by 08/16/2013

Interest Paid 2013:          340.37



⑆0640086371⑈                          325


Michael Hamilton
Loan Billing Statement

========================================================================

Remittance Summary

========================================================================

Loan Number
600346280  Principal Balance:      13,358.31   Interest Due:      273.75
           Principal Due:             153.69   Escrow Due:           .00
           Total Due:                 427.44

Total Principal Balance:     13,358.31   Total Interest Due:      273.75
Total Principal Due:            153.69   Total Escrow Due:           .00

                             *************************
Total Amount Due by 08/06/2013:  *          427.44     *
                             *************************



* * Please return this portion with your payment * *

L o a n   B i l l i n g   S t a t e m e n t



                            Total Amount Due:               427.44
                            Additional Principal:  _____
                            Additional Payment:    _____

Michael Hamilton
Juanita Hamilton
2405 Emmett Ave
Nashville TN  37206        Amount Enclosed:     $ _____

Date Payment Due:          08/06/2013
Loan Type:      Consumer Mthly Pymt      Pinnacle Bank
Loan Number:              600346280      PO Box 292487
Regular Payment T/C:            325      Nashville, TN  37229-2487

⑆06400863�7⑈                                    ⑈75

CAR CREDIT, INC.
3819 DICKERSON RD.
NASHVILLE, TN 37207
615-865-4346

NAr
1ST N
2ND N
RETURN

CERTIFIED MAIL™

7012 1010 0003 4352 6852

1000    37206

U.S. POSTAGE
PAID
NASHVILLE, TN
AUG 3, 2013
AMOUNT
$6.11
00029678-06

Michael Quanita Hamilton
2405 Emmett Ave
Nashville TN 37206

Marcia Campbell

**Pinnacle** SM

Michael Hamilton
Juanita Hamilton
2405 Emmett Ave
Nashville TN  37206

### * P a s t   D u e   N o t i c e *

| | | |
|---|---|---|
| Loan Type:          Consumer Mthly Pymt | Maturity Date: | 06/06/2017 |
| Principal Balance:        13,358.31 | Original Loan Date: | 05/22/2013 |
| Current Rate:              22.0000 | Original Loan Amount: | 13,445.38 |
| Interest Thru 08/21/2013:    402.57 | Last Payment Received: | 07/03/2013 |
| One Day's Interest:            8.05 | Last Payment Amount: | 427.44 |
| Late Charge Balance:          21.37 | | |

Collateral/Property: 2006 Chevrolet Silverado Truck
              Past Due Date:          08/06/2013
              Amount Past Due:            427.44
              Late Charges:               21.37

              Total Amount Due:          448.81

We may report information about your account to credit bureaus.  Late
payments, missed payments, or other defaults on your account may be
reflected in your credit report.

If Payment Has Been Made, Kindly Disregard This Notification

### * Please return this portion with your payment *

### P a s t   D u e   N o t i c e



Michael Hamilton                  Amount Past Due:        427.44
Juanita Hamilton                  Late Charges:            21.37
2405 Emmett Ave                   Total Amount Due:       448.81
Nashville TN  37206
                                  Amount Enclosed:     $_____

Date Payment Was Due:        08/06/2013
Loan Type:          Consumer Mthly Pymt    Pinnacle Bank
Loan Number:              600346280        PO Box 292487
Regular Payment T/C:            325        Nashville, TN  37229-2487